1  McGREGOR W. SCOTT
   United States Attorney
2  ROBERT J. ARTUZ
   Special Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5
6  Attorneys for Plaintiff
   United States of America
7



8              IN THE UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF THE APPLICATION        CASE NO.  2:20  SW  149     KJN
    OF THE UNITED STATES OF AMERICA
12  FOR AN ORDER PURSUANT TO § 2703(d)      APPLICATION
    RE: subscribers IDENTIFIED BY: phone
13  number 916-807-0027, phone number 916-
    223-0007, phone number 619-606-5002,
14  email address
    JOSHUA.B.GEORGE@HQ.DHS.GOV,             **UNDER SEAL**
15  email address JAE1683@YAHOO.COM, and
    IMEI# 014389001578781
16
17
18                    I.      **APPLICATION**

19      The United States of America, moving by and through its undersigned counsel, respectfully

20  submits under seal this ex parte application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed

21  Order would require Google LLC, an Internet service provider located in Mountain View, CA, to

22  disclose certain records and other information pertaining to the subscribers identified by : phone number

23  916-807-0027, phone number 916-223-0007, phone number 619-606-5002, email address

24  JOSHUA.B.GEORGE@HQ.DHS.GOV, email address JAE1683@YAHOO.COM, and IMEI#

25  014389001578781 as described in Part I of Attachment A. The records and other information to be

26  disclosed are described in Part II of Attachment A to the proposed Order. In support of this application,

27  the United States asserts:

28

## II.  LEGAL BACKGROUND

1.      Google LLC is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Google LLC to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.      This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i). *See* 18 U.S.C. § 2711(3)(A)(ii).

3.      A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## III.  RELEVANT FACTS

### INTRODUCTION

4.      The United States is investigating and prosecuting a conspiracy and fraud scheme involving former Social Security Administration (SSA) employee Eric Lemoyne Willis, former Federal Protective Service (FPS) employee Joshua Bilal George, and a subject named Darron Dimitri Ross (the "conspirators"). Particularly, the United States is investigating acts including that Willis used his official position at SSA to gather the personally identifiable information (PII) of Social Security beneficiaries, and the conspirators used that information to unlawfully divert the SSA benefits of at least 200 victims to fraudulently-created bank accounts. This investigation concerns violations of at least 18 U.S.C. § 371 [conspiracy], 18 U.S.C. § 641 [theft of government property], 18 U.S.C. § 1028A [aggravated identity theft], and 18 U.S.C. § 1343 [wire fraud].

## OVERVIEW OF THE INVESTIGATION

5.      On December 20, 2018, a federal grand jury indicted Eric Lemoyne Willis and Darron Dimitri Ross in this district on charges of conspiracy to defraud and commit crimes against the United States (18 U.S.C. § 371), theft of government property (18 U.S.C. § 641), aggravated identity theft (18 U.S.C. § 1028A), and wire fraud (18 U.S.C. § 1343). *United States v. Willis et al.*, 2:18-cr-266-WBS (E.D. Cal.). These defendants were previously arrested on a criminal complaint on December 11 and 13, 2018, respectively. On July 18, 2019, the government obtained a superseding indictment that added Joshua Bilal George as a co-defendant in the case, and he was charged with the same offenses. These conspirators conspired to steal public money from SSA.

6.      Willis worked as an SSA Operation Supervisor in Sacramento and Lodi from at least 2015 until his departure in January 2018. In this timeframe, Willis used his authority as an SSA employee to access the confidential Social Security records of numerous Social Security beneficiaries. These records contained PII including names, addresses, social security numbers, birth dates, account numbers, family information, and benefit payment amounts. Willis sought out PII for beneficiaries who used direct deposit for payment of large benefits. Willis then transferred this PII to his coconspirators, including Ross who resided in North Carolina, and George who worked as a Federal Protective Service Officer in San Diego.

7.      Ross and George's roles in these crimes included calling numerous SSA field offices and representatives across the country and using the stolen PII to impersonate the beneficiaries. The conspirators opened at least 44 online bank accounts under fraudulent identities to receive diverted SSA benefit payments. During these calls, Ross and George convinced some of the SSA representatives that they were the identity-theft victims, and caused the representatives to change the direct deposit account numbers to the fraudulent account numbers. The SSA then deposited the benefit payments into the fraudulent accounts until the fraud was detected. The conspirators were then free to withdraw the funds at ATMs and spend the money using debit cards.

8.      On June 17, 2019, Willis pleaded guilty to one count each of conspiracy to defraud the United States, theft of government property, and aggravated identity theft. Prior to pleading guilty to these charges, in March 2019, Willis debriefed with government representatives and provided

information about the above-described conspiracy and scheme as follows. Willis explained that George was an FPS law enforcement officer and responsible for security at SSA offices in the Sacramento area, including the office where Willis worked in 2014. Willis met George through work interactions and the two became friends. George also knew Ross because the two were childhood friends, and George introduced Willis to Ross in approximately late 2015. Although Ross lived in North Carolina, he traveled to Northern California and other locations where the three socialized.

9.     Willis also stated that he, Ross, and George conspired to defraud the SSA as described above beginning in late 2015. For example, Willis used his position at SSA to obtain PII of Social Security beneficiaries for use in the conspiracy. He used his work computer and employee access to obtain the PII and transferred it to Ross and George. They then used the PII to divert benefit payments to fraudulent accounts as described above. For example, Ross and George called SSA representatives, posed as Social Security beneficiaries, and used the PII to verify their false identities. If the representatives believed them to be the true beneficiaries, Ross and George then requested changes in the beneficiaries' direct deposit account numbers. If successful, SSA then proceeded to deposit benefit payments into fraudulent accounts under the conspirators' control. Willis communicated with Ross and George via phone calls and text messages using burner phones. Ross was responsible for withdrawing the proceeds from the drop accounts. Finally, the conspirators then divided the money among themselves and distributed their shares via in-person meetings, parcel, and bank deposits.

10.     Willis stated that his participation in the conspiracy and scheme continued at least until July 2017. He further stated that George participated until at least mid-2016, and he was not sure if George continued his involvement after that timeframe.

11.     In September 2019, Ross debriefed with government representatives and provided information about the above-described conspiracy and scheme as follows. Ross admitted the existence of the above-described conspiracy and scheme including himself, Willis, and George. Ross further stated that the idea of the fraud scheme originated with George in 2015. In late 2015, the three met at Willis's house in West Sacramento and hatched the scheme. Willis contributed information including his knowledge of the SSA system, and Ross, a convicted felon, contributed information and criminal experience relating to fraud. The three communicated using burner phones.

12.     Willis obtained the personal information of Social Security beneficiaries from his job and then provided the information to Ross. The information included items such as the person's SSN and date of birth. Willis originally provided the information via phone call but Ross told Willis to send it via text message because the information had to be precise and errors were easily made when passing the information over the phone. ROSS shared some of the beneficiary information and bank information with George so that George could call SSA to change their direct deposits. Ross also admitted that he personally called SSA. When asked to describe a typical call to SSA, Ross explained that initially he called SSA posing as the beneficiary and told the employee that he needed to change his direct deposit. Later, Willis and George suggested that they use a more detailed reason such as saying they moved and needed to update their address and banking information.

13.     Ross further stated that he obtained debits cards and accounts with the help of low-level participants (e.g., "runners") and distributed some of the cards to Willis and George. Early on and on multiple occasions, Ross had the runners video chat with George using Apple's FaceTime service. The purpose of the calls was to let the runners know that Ross and George were serious about them not running off with the cards. George was in uniform during the video calls with his marked police car sometimes visible, but George did not show his face.

14.     Ross further stated that, as the scheme continued, the activity between him and Willis and George ebbed and flowed. At times, Ross did not hear anything from the two for a while and suspected that they were cutting him out. Then the three were back in touch with each other for a time, and the scheme resumed. Ross stated that the scheme ended sometime in 2018 after SSA fired Willis.

15.     Investigators have identified at least 200 beneficiaries who were victims these crimes, and the total fraud loss suffered by SSA has exceeded approximately $480,000.

## ADDITIONAL EVIDENCE OF THE CONSPIRATORS' CRIMES

### Eric Willis

16.     SSA terminated Willis from employment on January 5, 2018. At the time of his termination, Willis was an Operations Supervisor at the SSA field office in Lodi, California where he worked from February 7, 2016 to the date of his termination. Prior to his reassignment to the Lodi office, Willis was an Operations Supervisor at SSA's South Sacramento field office. All of Willis' duty

stations since starting with SSA in 2003 were located within the Eastern District of California.

17. As of October 29, 2018, through examining SSA and bank records, this investigation has identified at least 200 Social Security retirement and disability beneficiaries whose benefits were unlawfully diverted to other bank accounts ("drop accounts") and whose SSA records Willis accessed prior to each fraudulent change. After Willis queried a given victim, an unidentified individual then made a phone call to an SSA field office somewhere in the U.S. from a variety of apparent prepaid cellphone numbers (commonly referred to as "burner phones"), used the victim's personally identifiable information to impersonate the victim to an SSA employee, and then successfully changed the victim's direct deposit to a drop account. SSA then paid the victim's next Social Security payment to the drop account. In most cases, the victim contacted SSA after the first missing Social Security payment. SSA then restored the original direct deposit information and reissued the missing payment to the victim. However, in some cases the victim did not contact SSA for several months or more.

18. For 148 of the victims, SSA records show Willis used his SSA computer to access reports for each victim prior to the fraudulent direct deposit change. For approximately 32% of the victims, the fraudulent direct deposit changes were made within 30 days of Willis accessing their SSA records, approximately 74% of the direct deposit changes were made within 90 days, and approximately 97% were made within 180 days. The first known victim's direct deposit information was fraudulently changed on December 3, 2015. The most recent fraudulent direct deposit changes were for two victims that both occurred on June 5, 2018. The benefits of the two most recent victims were diverted until their checks were reported missing on July 10, 2018 and October 18, 2018, respectively. The total estimated theft loss for the 200+ known victims has exceeded $480,000.

19. Investigators have found no explanation to justify an apparent 100% correlation between Willis' query of a given Social Security Number and the fraudulent direct deposit change which follows shortly thereafter. Since Willis worked in an SSA field office whose primary role is to serve the public within its geographic area of responsibility, it is notable that approximately 58% of the victims resided outside of the geographic service areas for the Lodi and South Sacramento SSA offices where Willis worked. More significantly, approximately 24% of the victims resided outside of the state of California entirely. There are reasonable grounds to believe that Willis accessed these victims' records for

1   improper reasons, including to collect the personally identifiable information necessary to unlawfully

2   change each victim's direct deposit to a drop account.

**Bank Records for Drop Accounts**

4      20.     The Social Security benefits of the 200+ known direct deposit fraud victims were

5   diverted to various drop accounts held at American Express National Bank, Green Dot, and Metabank.

6   All three of these financial institutions offer prepaid debit cards available for purchase in a retail store or

7   online. Many of these prepaid debit cards have the ability to receive direct deposits like a traditional

8   bank account. Furthermore, since the accountholder information is usually provided online, it is easy to

9   provide false accountholder information when setting up the account. Prepaid debit cards are commonly

10   utilized in direct deposit fraud schemes against SSA.

11      21.     This investigation has identified at least 44 American Express, Green Dot, and Metabank

12   accounts that were used as drop accounts for the victims' Social Security benefits. In October 2018, FBI

13   Forensic Accountant Frank Schuster examined bank records for the 44 drop accounts and provided the

14   following information in a FBI Forensic Analysis Report:

15           All accounts reviewed were bank and prepaid debit cards available for purchase online or

16           retail stores. The gross amount of monies coming in for all accounts was $475,346. The

17           majority of the money coming into the accounts were SSA beneficiary deposits that were

18           changed from the victims' normal bank account and into the 44 accounts; the SSA direct

19           deposits made up over 95% of the total monies received for a total of $454,641. Total

20           money going out of all accounts was $446,185 of which $412,412 (over 92%) were ATM

21           withdrawals. The majority of the withdrawals occurred in the Charlotte, North Carolina

22           area at roughly 70%, while approximately 15% occurred in the San Diego/Pasadena,

23           California area, 5% in Atlanta, Georgia, 5% in Sacramento, California area, and 5% in

24           Las Vegas, Nevada and various locations in Utah area.

25   Since the date of this report, this investigation has uncovered additional victims, drop accounts, and SSA

26   losses as described, in part, herein.

27      22.     After reviewing bank records for the drop accounts, the aforementioned FBI Forensic

28   Accounting Analysis report, and speaking with several of the purported accountholders via phone,

investigators determined that the accountholders named on the drop accounts were actually identity theft victims whose identities were used to open the drop accounts without their knowledge. All accountholder addresses for the drop accounts are Charlotte, North Carolina addresses.

23.     As one example, Green Dot account ending in 0799 is a drop account associated with eight of the direct deposit fraud victims. J.D. is the individual listed as the accountholder. An investigator spoke to J.D. via phone, and he stated he has never banked with Green Dot.

**Darron Ross**

24.     Surveillance footage provided by First Citizens Bank shows an automated teller machine (ATM) withdrawal from Green Dot drop account 0799 for $403.00 on June 17, 2017, at a First Citizens Bank drive-thru ATM in Huntersville, North Carolina. In the footage, the person conducting the withdrawal is driving a dark-colored Mercedes-Benz Sprinter van bearing North Carolina plates EH4037. According to a North Carolina vehicle registration search conducted by Customs and Border Protection's National Law Enforcement Communications Center, the vehicle is registered to Darron Dimitri Ross, North Carolina driver's license number 38643319, residence 9808 Nations Ford Road, Charlotte, NC 28273. The person conducting the withdrawal appears to match Ross's driver's license photo.

25.     According to Officer Brian Tillack, Probation/Parole Officer, North Carolina Department of Public Safety, Ross was under his supervision for probation in 2018 and 2019 for identity theft-related offenses in August 2015 and January 2016. Ross was under Officer Tillack's supervision also for a previous period that ended in January 2017. An investigator provided Officer Tillack with still images of the aforementioned First Citizens Bank withdrawal conducted on June 17, 2017. Additionally, an investigator provided still images of three other withdrawals at Sun Trust Bank ATMs from Green Dot drop account 1023 on March 17, 2017; May 9, 2017; and January 19, 2018. Officer Tillack stated, "The first picture on 06/17/2017 is hard for me to tell. The others are most certainly Mr. Ross."

26.     T-Mobile toll records for Willis's phone number (916-710-3366) for the period 04/05/2017 to 02/27/2018 list 113 call records between Willis' phone number (916-710-3366) and Ross' phone number (980-254-1979). A LexisNexis Accurint report associates phone number 980-254-1979 with Ross. Officer Tillack confirmed 980-254-1979 as a phone number he previously used to contact

1 | Ross. T-Mobile records state Willis is the subscriber for phone number 916-710-3366 with service
2 | effective 04/04/2017.

3 | 27. According to American Express records, the accountholder for the drop account ending
4 | in 5403 is D.J. with a customer address of 9808 Nations Ford, Charlotte, North Carolina, Ross's address
5 | of record from Ross's North Carolina driver's license and other records. Additionally, American
6 | Express lists 980-254-1979, Ross's personal cellphone number, as a customer phone number for this
7 | account. SSA paid the Social Security benefits of two direct deposit fraud victims to drop account 5403.

8 | 28. The Police Department of Mooresville, North Carolina ("Mooresville PD"), arrested Ross
9 | on the evening of January 30, 2016, for credit card fraud. Based on discussions with Detective Chris
10 | Jorgensen of Mooresville PD and a review of the police reports, Mooresville PD had probable cause to
11 | believe that Ross had recently communicated with a coconspirator via text message on a cellphone from
12 | his vehicle to commit fraud. On the day of Ross's arrest, Mooresville PD seized two cellphones in
13 | Ross's possession incident to his arrest, and it located and seized a third cellphone after a warrantless
14 | search of Ross's vehicle pursuant to probable cause. Mooresville PD was able to determine that at least
15 | one of the seized phones was used to communicate with Ross's coconspirator. The three cellphones
16 | seized from Ross include two Apple iPhone cellphones and a Samsung cellphone.

17 | **Evidence Obtained from Ross's Samsung Cellphone**

18 | 29. As described above, Mooresville PD seized two iPhone cellphones and one Samsung
19 | cellphone from Ross. These three phones were subsequently transferred to the custody of SSA OIG and
20 | the contents extracted and examined pursuant to a federal search warrant. To follow is a summary of
21 | communications and data obtained from the Samsung model SM-G920P Galaxy S6 phone ("the
22 | Samsung"), IMEI# 256691573502255248, phone number 980-200-4859.

23 | 30. The Samsung's call log and text messages indicate dozens of communications between
24 | Ross (using the Samsung) and two apparent prepaid cellphone numbers, 702-929-1645 and 310-619-
25 | 3674. The communications between Ross's Samsung and the two prepaid numbers correlate to other
26 | activity associated with Willis (discussed below). Therefore, there are reasonable grounds to believe
27 | Willis was the person using these two apparent prepaid cellphone numbers to communicate with Ross.
28 | / / /

**Personally Identifiable Information Sent by Willis to Ross**

31.     There are reasonable grounds to believe Willis used the two apparent prepaid cellphone numbers, 702-929-1645 and 310-619-3674, to send Ross, via text message to Ross's Samsung, the personally identifiable information (PII) of at least six Social Security beneficiaries. The times of the text messages match the times that Willis accessed the beneficiaries' SSA records, and the content of the text messages matches the content of the SSA records that Willis accessed.

32.     The chart below demonstrates the correlation between the time that Willis queried each beneficiary with his SSA computer and the time that the corresponding text message containing the PII was sent to Ross.

| Beneficiary | Willis' Access of SSA Record (EST) | Text Message Sent to Ross (EST) |
| --- | --- | --- |
| D.C. | 01/11/2016 11:06 | 01/11/2016 11:07 |
| L.C. | 01/11/2016 17:49, 18:05, 18:07 | 01/11/2016 18:04 |
| L.N. | 01/23/2016 13:42, 13:45, 13:46, 13:49 | 1/23/2016 13:48 |
| R.N. | 01/28/2016 14:00, 14:01, 14:11, 14:15, 14:16 | 1/28/2016 14:15 |
| A.S. | 01/29/2016 18:21 | 1/29/2016 20:36 |

33.     The text messages sent by Willis to Ross contained the following PII for each beneficiary which matches the information SSA had on file at the time: full name, date of birth, social security number, address, telephone number, mother's name, monthly Social Security payment amount, and the direct deposit routing number and account number where SSA deposited the beneficiary's monthly Social Security benefits. This appears to be the specific PII that SSA uses to validate the identity of a caller before making changes to a beneficiary's direct deposit over the phone. The SSA records that Willis accessed contained all of the PII described above.

34.     Additionally, on 01/19/2016 at 18:35 EST, Willis used 310-619-3674 to send a message to Ross's Samsung, which asked, "Did in [sic] give you a Rondo on for [G.B.'s last name]". At 18:49, Ross replies, "I don't have a [G.B.'s last name]" to which Willis replies at 23:52, "Cool sending that one tom". SSA records show Willis first queried G.B. on 01/11/2016 and then queried G.B. again on 01/19/2016 at 18:34 hours EST and on 01/20/2016 at 17:59 hours EST.

/ / /

**Email Containing Personally Identifiable Information**

35.     The Samsung contained an email sent from dimitriglen85@gmail.com, display name "Dimitri Glen", to xross114@gmail.com, display name "Xavier Ross", with no subject and dated 12/17/2015 at 11:28(UTC-5). The first line of the email was "Trip to California 8007721213". Phone number 800-772-1213 is the primary public phone number for SSA. The remainder of the email contained the PII of five individuals who were Social Security beneficiaries at the time and whose Social Security benefits were fraudulently diverted in December of 2015.

36.     The email contained the following PII for each victim which matches the information SSA had on file at the time: full name, date of birth, social security number, address, telephone number, mother's name, monthly Social Security payment amount, and the direct deposit routing number and account number where SSA deposited the victim's monthly Social Security benefits. Willis, using his official access to Social Security records, queried each of these victims at least once no more than 30 days prior to the date of the email.

37.     As one example, Willis accessed the Social Security records of P.B. on 11/30/2015 and 12/01/2015. The records Willis accessed specifically contained and matched the PII described in the preceding paragraph. P.B.'s direct deposit was then fraudulently changed to an American Express account ending in 9849 on 12/03/2015. Bank records show that SSA deposited three checks for amounts between $1,188 and $1,238 each into this drop account. After each deposit, the majority of the money was withdrawn via ATM cash withdrawals in North Carolina. On 02/05/2016, SSA recorded that P.B.'s direct deposit was changed without his authorization and placed a fraud block on P.B.'s account. The bank records then show that SSA deposited $2,103 for a different victim, P.P., into the same American Express drop account on 04/15/2016. SSA subsequently submitted a fraud report to SSA OIG on 05/04/2016 which stated P.P. never held an account at American Express.

38.     Additionally, for two other victims listed in the same email, R.D. and M.M., the email contained not only the victim's PII and Social Security information described above, but also the corresponding routing number and account number of the drop account to which their benefits were fraudulently diverted. SSA records show that R.D. and M.M.'s benefits were also diverted in December of 2015 to the same accounts contained in the email from the Samsung phone.

**Deposits into Willis's Bank Account**

39.     Via text message, Willis and Ross discuss Ross making a deposit into Willis' bank account in the exchange below:

> 1/29/2016 20:38(UTC-5) To: 3106193674
> Ross: Where am i sending the bread to?
>
> 1/29/2016 20:39(UTC-5) From: 3106193674
> Willis: Drop in my account
>
> 1/29/2016 20:39(UTC-5) To: 3106193674
> Ross: Ok
>
> 1/30/2016 12:52(UTC-5) To: 3106193674
> Ross: That's in

40.     The above text messages correspond to a deposit made into Willis's personal Wells Fargo bank account on January 30, 2016. In addition to the aforementioned cellphones, Mooresville PD also seized a Wells Fargo Bank transaction receipt found in Ross's possession. An investigator examined a photograph of this receipt and found that it was for a $4,000 cash deposit into a Wells Fargo bank account ending in 8228. According to the receipt, the deposit occurred at 12:51 PM on January 30, 2016, several hours prior to Mooresville PD's arrest of Ross. The receipt indicated the deposit would be credited to the account on February 1, 2016.

41.     An investigator compared the Wells Fargo transaction receipt seized from Ross to bank records for Wells Fargo account number 1288188228 held by Willis. He located a deposit for $4,000 made in a branch/store and credited to the account on February 1, 2016. He spoke to Wells Fargo who confirmed that the $4,000 deposit listed on Willis's statement for account number 1288188228 was the same deposit listed on the receipt seized from Ross. The deposit occurred at Wells Fargo branch number 67393 located at 1616 Central Ave in Charlotte, North Carolina. The Wells Fargo branch is located less than 30 miles from the location where Mooresville PD arrested Ross.

42.     Separate from the deposit discussed above, the Samsung contained a photo of a Wells Fargo transaction receipt dated December 23, 2015, for a $1,900 cash deposit into a Wells Fargo account ending in 8228 and made at Wells Fargo branch number 0000658 which according to Wells Fargo, is located in San Diego, CA. The date, time, location, amount, and account number match a December 23, 2015, cash deposit that appears on bank records for Wells Fargo account number

1288188228, the same account belonging to Willis described above.

43.    It appears that the two cash deposits described above for $4,000 and $1,900 were both instances where Ross deposited cash obtained through illicit means into the Wells Fargo account of Willis.

### Joshua George

44.    According to bank records for only four drop accounts (three Metabank and one Green Dot), approximately 56 cash withdrawals totaling approximately $17,695.25 were conducted in southern California between August 19, 2016 and December 8, 2017. Of these transactions, 44 were conducted in the San Diego area, 7 were in the Orange County area, and 5 were the Los Angeles area. Bank statements for George's USAA checking 4909 show a change in address from a West Sacramento address for the September 2015 statement to an apartment in San Diego for October 2015 statement. In March 2016, the statement address changes to an address on Santa Sofia in San Diego. Finally, in September 2018, the statement address changes to the same Chula Vista address where agents later arrested George in July 2019.

45.    One of the Green Dot drop accounts discussed above – account ending in 0799 – was accessed via the internet from IP address 76.238.229.143 on October 22, 2016, and January 10, 2017. According to AT&T U-Verse records, IP address 76.238.229.143 was assigned to subscriber Joshua George on the dates the Green Dot account was accessed online. AT&T U-Verse subscriber information lists George's email as jae1683@yahoo.com, and the service and billing addresses as 5430 Santa Sofia, San Diego, CA. That subscriber information also shows the following information associated with George: Account Id = 134920240; Account Name = JOSHUA GEORGE; Member Id = joshua9657@att.net; and Established = 04/11/2014. The service was provided at the following address: 5430 Santa Sofia, San Diego, California. This information shows that someone at George's house accessed one of the fraudulent drop accounts via his internet account on these two separate occasions.

46.    A March 2, 2018, application for CBP's Global Entry program lists the following information for Joshua Bilal George: cell phone 916-807-0027; email jae1683@yahoo.com; home address 5430 Santa Sofia, San Diego, CA. Additionally, according to the City of San Diego's Active Business Listing available online, George is the sole owner of JBG Supply, an electronic shopping and

mail-order company registered to 5430 Santa Sofia, San Diego, CA. Additional information listed includes phone number 916-807-0027. Additionally, AT&T cellphone subscriber records show that George was the account owner for this -0027 number from November 27, 2012 until March 27, 2018. AT&T toll records for this same account show that George used an iPhone with this phone number and during this same time period.

47.    George's employment records at FPS show that he was assigned a government iPhone with phone number 916-223-0007 at least as early as August of 2015 and continuing through at least the date of his arrest in this case on July 23, 2019.

48.    AT&T phone records also show that George was the subscriber for phone number 619-606-5002 from at least as early as March 27, 2018, and continuing through at least approximately July 24, 2019. The records further show that, during this time, George used an iPhone with this number.

49.    Sprint toll records for Willis (916-710-3366) show approximately 14 voice calls between Willis and George (916-807-0027) between December 26, 2016, and April 2, 2017. Willis then ported 916-710-3366 from Sprint to T-Mobile. After Willis changed carriers, T-Mobile toll records for Willis (916-710-3366) show approximately 177 phone calls between Willis (916-710-3366) and George (916-807-0027) between April 22, 2017 and February 26, 2018.

50.    AT&T toll records for Ross (980-254-1979) show approximately 772 voice calls between Ross (980-254-1979) and George (916-807-0027) between November 1, 2015, and February 7, 2018. According to AT&T records, Ross then switched to 704-430-4344 on or about February 8, 2018. AT&T toll records for Ross (704-430-4344) show approximately eight voice calls between Ross (704-430-4344) and George (916-807-0027) between February 27, 2018 and March 18, 2018.

51.    As described above, George then switched from 916-807-0027 to 619-606-5002 on March 27, 2018. AT&T toll records for George (619-606-5002) show approximately 22 voice calls between George (619-606-5002) and Ross (704-430-4344) between April 10, 2018, and December 12, 2018. The same AT&T toll records for George show approximately six calls from George (916-807-0027) to Willis at 916-490-6170, a number that Willis listed as his current home phone number on employment documents dated July 23, 2018.

52.    As a further example of the conspirators' communications, the below is a summary chart

showing at least some of their three-way call activity in the months of November 2015, August 2016, May 2017, and August 2017. Phone records show that the phone number 916-710-3366 was assigned to Willis, and phone number 980-254-1979 was assigned to Ross, in this timeframe.

Apparent Three-Way Call Activity Among Willis, Ross, and George

| Event | Line | Prod Item | ConnDateTime (UTC) | ConnDateTime (PST) | Elapsed Time | Originating Number | Terminating Number | Other Party Number | Other Party Name | Feature |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | (916) 807-0027 | 157 | 11/12/15 00:01 | 11/11/15 16:01 | 25:57 | (980) 254-1979 | (916) 807-0027 | (980) 254-1979 | Darron Ross | [NIOP:CMH:MPS] |
| 1 | (980) 254-1979 | 271 | 11/12/15 00:01 | 11/11/15 16:01 | 25:57 | (980) 254-1979 | (916) 807-0027 | (916) 807-0027 | Joshua George | [NIOP:CMH:MPS] |
| 1 | (916) 807-0027 | 160 | 11/12/15 00:02 | 11/11/15 16:02 | 24:51 | (916) 807-0027 | (916) 710-3366 | (916) 710-3366 | Eric Willis | [CMH:MPS] |
| 2 | (916) 807-0027 | 165 | 11/12/15 00:28 | 11/11/15 16:28 | 15:49 | (916) 807-0027 | (980) 254-1979 | (980) 254-1979 | Darron Ross | [CMH:MPS] |
| 2 | (980) 254-1979 | 277 | 11/12/15 00:28 | 11/11/15 16:28 | 15:49 | (916) 807-0027 | (980) 254-1979 | (916) 807-0027 | Joshua George | [CMH:MPS] |
| 2 | (916) 807-0027 | 166 | 11/12/15 00:28 | 11/11/15 16:28 | 15:28 | (916) 807-0027 | (916) 710-3366 | (916) 710-3366 | Eric Willis | [CMH:MPS:VCORR] |
| 3 | (916) 807-0027 | 171 | 11/12/15 00:44 | 11/11/15 16:44 | 3:30 | (916) 807-0027 | (980) 254-1979 | (980) 254-1979 | Darron Ross | [CMH:MPS] |
| 3 | (980) 254-1979 | 282 | 11/12/15 00:44 | 11/11/15 16:44 | 3:30 | (916) 807-0027 | (980) 254-1979 | (916) 807-0027 | Joshua George | [CMH:MPS] |
| 3 | (916) 807-0027 | 172 | 11/12/15 00:44 | 11/11/15 16:44 | 3:08 | (916) 807-0027 | (916) 710-3366 | (916) 710-3366 | Eric Willis | [CMH:MPS:VCORR] |
| 4 | (916) 807-0027 | 4339 | 08/10/16 04:55 | 08/09/16 21:55 | 21:12 | (916) 807-0027 | (980) 254-1979 | (980) 254-1979 | Darron Ross | [CMH:MPS] |
| 4 | (980) 254-1979 | 8459 | 08/10/16 04:55 | 08/09/16 21:55 | 21:12 | (916) 807-0027 | (980) 254-1979 | (916) 807-0027 | Joshua George | [CMH:MPS] |
| 4 | (916) 807-0027 | 4340 | 08/10/16 04:57 | 08/09/16 21:57 | 15:34 | (916) 807-0027 | (916) 710-3366 | (916) 710-3366 | Eric Willis | [CMH:MPS] |
| 5 | (916) 807-0027 | 8105 | 05/14/17 16:27 | 05/14/17 09:27 | 59:56 | (916) 807-0027 | (980) 254-1979 | (980) 254-1979 | Darron Ross | [CMH:MPS] |
| 5 | (980) 254-1979 | 17492 | 05/14/17 16:27 | 05/14/17 09:27 | 59:56 | (916) 807-0027 | (980) 254-1979 | (916) 807-0027 | Joshua George | [CMH:MPS] |
| 5 | (916) 807-0027 | 8112 | 05/14/17 17:11 | 05/14/17 10:11 | 0:50 | (916) 807-0027 | (916) 710-3366 | (916) 710-3366 | Eric Willis | [CMH:MPS] |
| 5 | (916) 807-0027 | 8113 | 05/14/17 17:15 | 05/14/17 10:15 | 2:43 | (916) 710-3366 | (916) 807-0027 | (916) 710-3366 | Eric Willis | [NIOP:CMH:MPS] |
| 6 | (916) 807-0027 | 10419 | 08/06/17 22:16 | 08/06/17 15:16 | 14:23 | (916) 710-3366 | (980) 254-1979 | (980) 254-1979 | Darron Ross | [NIOP:CMH:MPS] |
| 6 | (980) 254-1979 | 21285 | 08/06/17 22:16 | 08/06/17 15:16 | 14:23 | (916) 710-3366 | (980) 254-1979 | (916) 807-0027 | Joshua George | [NIOP:CMH:MPS] |
| 6 | (980) 254-1979 | 21287 | 08/06/17 22:23 | 08/06/17 15:23 | 7:38 | (916) 710-3366 | (980) 254-1979 | (916) 710-3366 | Eric Willis | [NIOP:CMH:MPS] |

These three-way calls are consistent with Willis's and Ross's statements that three regularly communicated regarding the conspiracy, especially in late 2015 when they were planning the scheme.

53. AT&T and other toll records identity a TCT Mobile Limited Tracfone (A463BG), IMEI# 0143890015787803[1] (number 916-803-8715), that was communicating with phones linked to both Willis and Ross in early 2016. Toll records for this Tracfone show that it was used to call several SSA offices in early 2016 to perpetrate this fraud scheme. The juxtapositions of calls made between the Tracfone and SSA offices, and calls made between George's personal phone (916-807-0027) and Willis or Ross, evidence that George used this Tracfone as a burner phone to commit fraud. For example, on several occasions, the time between when George called Ross or Willis on his personal phone and the time this burner phone made fraudulent calls was on the order of minutes.

54. Additional evidence obtained via search warrant from Ross's iCloud and Google

---

[1] Because this listed IMEI number is 16 digits, it is likely an IMEISV number. *See, e.g.*, https://stackpointer.io/mobile/how-to-compute-imei-from-imeisv/212/. This number can be converted to the device's IMEI# using a known algorithm. *Id.* Using this conversion method, the IMEI# is 014389001578781. Online IMEI checkers confirm that this particular number was assigned to a Tracfone Model# A463BG. *See, e.g.*, https://www.imei.info/.

accounts shows photos of the three conspirators partying together on several occasions in locations such as Las Vegas and Southern California in the timeframe of the conspiracy. For example, the below photo shows the three partying at the Penthouse Day Club in West Hollywood, California, in April 2017. On these occasions, George was a federal law enforcement officer who was spending significant time with Ross who was a convicted felon. The geolocation information obtained from the below image file confirmed the location.

4/16/2017 Photo of George (left), Ross (center), and Willis (right)



**Target Account(s)**

55.     Google's products and services—e.g., Android, YouTube, Google Books, Google Search, Google Maps, Gmail, Google Calendar, Google+, Google Drive, Google Calendar, Google Hangouts, and Google Photos—are highly prevalent and commonplace in the digital world of recent years. For some of these products, a Google account is required; and for others, a Google account helps users store, maintain, and transfer account information and content. There are reasonable grounds to believe that a

participant in the above-described conspiracy and scheme used Google products and services and had a registered a Google account in some form. Additionally, as discussed above, a Tracfone (IMEI# 0143890015787803) was used in the conspiracy and scheme, and Tracfone records show that this model likely used Google's Android mobile operating system. Based on public information concerning Google products, services, and subscriber accounts, users of Android-based mobile devices typically activate it with a Google account.

56.     This application seeks non-content information about Google target accounts, which may contain evidence of the above-described crimes and help identity the conspirators. The target accounts, identified in Attachment A, include any Google account linked to any of the following identifiers in the timeframe of the conspiracy and scheme. Particularly, George used the following phone numbers to communicate with Willis and Ross: 916-807-0027, 916-223-0007, 619-606-5002. George's FPS employment records show that he was assigned the following email address at work: JOSHUA.B.GEORGE@HQ.DHS.GOV. And AT&T and USAA bank records show that George also used the personal email address JAE1683@YAHOO.COM at least as early as 2010. Additionally, a Tracfone with IMEI# 014389001578781 has been linked to the conspiracy. Google can use these identifiers to find Google accounts and other information that are linked to the conspiracy and relevant to the investigation.

## Background Concerning Google Accounts

57.     The conspirators in this scheme exchanged and managed voluminous amounts of highly specific information such as victims' personally identifiable information—e.g., name, date of birth, SSN, and bank information—as well as drop account information—e.g., routing number, account number, online username and password, and the PIN for each drop account's debit card to make cash ATM withdrawals and debit purchases. A cloud storage service such as Google Drive would allow the aforementioned information to be stored in an electronic file, such as a document or spreadsheet, easily accessed by conspirators using electronic devices in multiple locations. Similarly, Gmail may have been used to exchange this information. There are reasonable grounds to believe that any Gmail and Google Drive data for the target accounts contain evidence of the conspiracy and scheme.

58.     Gmail and its corresponding Android app may use Google Drive, Google's cloud storage

service, to view certain attachments and in general, Gmail is streamlined to save email attachments directly to the user's Google Drive. There are reasonable grounds to believe that any Google Drive data for the target accounts contains email attachments originating from the user's Gmail account. Even if the user deleted the original email in Gmail, the attachment may still be present in Google Drive.

59.     Smartphones commonly synchronize data via the internet to cloud storage services and to the provider's servers in general. This data includes but is not limited to, photos, contacts, phone settings, internet browsing history, and bookmarked webpages. The Samsung uses Google's mobile operating system, Android. Given that Android is a Google product, Android phones are generally predisposed to synchronize data to the user's Google account. For example, an Android phone may automatically upload pictures to Google's cloud photo storage service, Google Photos, and/or Google Drive in order to back up the photos in case the phone is lost or damaged, and to free up local storage space on the phone. The photo found on the Samsung of a Wells Fargo transaction receipt for a $1,900 cash deposit into Willis' Wells Fargo account is one example of photographic evidence that the Samsung, or any other device connected to the target accounts, may have synchronized onto Google's servers. Furthermore, internet browsing-related data synchronized to the target accounts may evidence access of the websites of the financial institutions used for the drop accounts, e.g. American Express, Green Dot, and Metabank. Therefore, there are reasonable grounds to believe the target accounts contain photos, internet browsing-related data, and other data that evidence the conspiracy and scheme.

60.     Login session information may identify devices and IP addresses used to access the target accounts and may in turn correspond to devices and IP addresses associated with Willis, Ross, and George. For Google accounts, Google can use a process known as cookie analysis to identify other Google accounts that were accessed using the same computer that accessed a given Google account. This information may then in turn identify the individual(s) controlling the target accounts.

61.     Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name gmail.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including

retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. Such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

62.     Email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

63.     Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

64.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. Such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

65.     Google keeps records of which gmail.com accounts are accessed from the same electronic device, such as the same computer, through "machine cookies," which are small pieces of text

sent to the user's device when visiting Google. This application and order requires Google to identify any other accounts accessed by the same device that accessed the target accounts described in Attachment A, including accounts linked by machine cookies. The application and order also asks Google to identify any other accounts that are registered with the same email addresses or telephone numbers as the target accounts.

66.     As explained herein, information stored in connection with a Google account account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. The information stored in connection with a Google account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

## IV.     **GOVERNMENT REQUESTS**

67.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, this information will help the United States identify and locate the individual(s) who are responsible for the events described above, and determine the nature and scope of their activities. Accordingly, the United States requests that Google LLC be directed to produce all items described in Part II of Attachment A to the proposed Order.

68.     The United States further requests that the Order require Google LLC not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for 180 days from the date of the order, unless extended. See 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." Id. In this case, such an order would be appropriate. Although the above-described defendants are under a public indictment, this criminal case is still under investigation, and aspects of which are neither public nor known to all of the targets of the investigation. Accordingly, there is reason to believe that notification of the existence of the requested

Order will seriously jeopardize the investigation. For example, premature disclosure may cause one or more targets to destroy key electronic evidence that is sought by this application or similar electronic evidence that may be the subject of future legal process. See 18 U.S.C. § 2705(b)(3), (5).

69. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. Although the above-described defendants are under a public indictment, this criminal case is still under investigation, and aspects of which are neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Dated:  February 6, 2020

McGREGOR W. SCOTT
United States Attorney

By: _____

ROBERT J. ARTUZ
Special Assistant United States Attorney